UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Criminal Action |
| v. ) | No. 19-10152-PBS |
| ) | |
| MIRTHA LARA LARA, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

February 14, 2020

Saris, D.J.

    Defendant Mirtha Lara Lara is charged with False Representation of a Social Security Number under 42 U.S.C. § 408(a)(7)(B) and Aggravated Identity Theft under 18 U.S.C. § 1028(A)(a)(1). Lara Lara now moves to suppress statements she made to members of federal law enforcement on April 18, 2019. The Defendant argues that the statements were obtained in violation of the Fifth Amendment because the police continued to question her after she invoked her right to remain silent. The Government contends that Lara Lara did not unambiguously invoke that right. The Court conducted an evidentiary hearing at which the two interviewing officers testified. The Court has also reviewed a transcript and audio tape of the interview. After hearing, the Court **ALLOWS** the Defendant's motion to suppress (Docket No. 31).

1

**FACT FINDINGS**

After evaluating the credibility of the witnesses, the transcript and audio tape of the interview, and the documents submitted by the parties, the Court makes the following findings of fact.

Between seven and ten armed law enforcement officers arrested Lara Lara at her home at approximately 6 a.m. on April 18, 2019. Docket No. 39 at 1, 7. The officers executed a search warrant at the home while Lara Lara's two children were present. Id. at 1-2.

After informing Lara Lara that they had a warrant for her arrest, Task Force Officer Mark Shaughnessy and Special Agent Sean Rafferty interviewed the Defendant in her kitchen. Lara Lara was not in handcuffs during the interview, but she was not free to leave. The officers did not draw their arms during the interview. Lara Lara is Spanish-speaking.

Shaughnessy first read Lara Lara a Spanish-language ICE form detailing her Miranda rights. Docket No. 31-2. Lara Lara initialed the form, and at 6:29 a.m. signed underneath a portion of the form titled "RENUNCIA A LOS DERECHOS," which stated that the signatory understood and waived her rights. Id. This portion of the interview was not recorded. At 6:31 a.m., Rafferty began a recorded interview with the Defendant, with Shaughnessy acting as an interpreter. Docket No. 40 at 2. Lara Lara and Shaughnessy

2

spoke in Spanish, while Rafferty, who is not Spanish-speaking, spoke almost entirely in English. Docket No. 31-1 [hereinafter Tr.]. The interview lasted approximately 30 minutes. Id.

Rafferty first asked the Defendant to confirm that she had received her Miranda rights and initialed next to each line on the Waiver of Rights form to indicate that she understood them. Tr. at 1. The Defendant confirmed that she had. Id. Rafferty then asked the Defendant if she had any questions, and she responded that she did not. Id.

The following exchange then took place (with portions spoken in Spanish underlined):

1. Rafferty: Do you have any questions of me at this time?
2. Shaughnessy: Do you have any questions right now?
3. Defendant: No.
4. Rafferty: Okay. Are you willing to talk to me? We'll go over everything today?
5. Shaughnessy: Do you want to talk with an agent?
6. Defendant: Pardon me?
7. Rafferty: Yeah.
8. Defendant: Pardon me? Like a [unintelligible]?
9. Shaughnessy: No, no. Do you want to talk to him? If he has questions for you?
10. Defendant: I don't know.
11. Rafferty: You, you . . . You can . . . You don't have to answer all the questions. If you want to not answer all the questions you don't have to answer all the questions. I'd like to talk to you about a couple of things I have here today. If there is a question you don't want to answer you don't have to answer it.
12. Shaughnessy: He wants to talk to you. He has questions for you. If you don't want to talk . . . to talk to him, it's alright. But if you want to, some questions, yes.
13. Rafferty: Yes or no?
14. **Defendant: No.**

3

<u>15.</u>  Shaughnessy: You don't want to talk?
**<u>16.</u>  Defendant: No.**
<u>17.</u>  Shaughnessy: No, you don't want to say anything?
**<u>18.</u>  Defendant: It's just that I don't have anything to talk about.**
<u>19.</u>  Shaughnessy: If he has questions, do you want to talk to him?
<u>20.</u>  Rafferty: I want to go over what we charged you with. You don't have to talk if you don't want to but I'd like you to talk about it. If you don't want to answer a question you don't have to.
**<u>21.</u>  Defendant: No. I don't have to talk. I don't want him to question me.**
<u>22.</u>  Shaughnessy: Sorry?
**<u>23.</u>  Defendant: That I don't want him to ask me . . .**
<u>24.</u>  Shaughnessy: You don't want to?
<u>25.</u>  Shaughnessy: Okay, she said no. She does not want to talk.
<u>26.</u>  Rafferty: Okay. You don't want to talk to us?
<u>27.</u>  Shaughnessy: You don't want to talk to him?
<u>28.</u>  Defendant: But about what? All right, ask me a question, okay.
<u>29.</u>  Shaughnessy: She said she does want to talk.
<u>30.</u>  Rafferty: Okay. You sure you want to talk?
<u>31.</u>  Defendant: Isn't it that supposedly what I say may be used against me?
<u>32.</u>  Shaughnessy: What?
<u>33.</u>  Defendant: Doesn't it say there that what I say may be used against me? What is it that we are going to talk about?
<u>34.</u>  Shaughnessy: She wants to know what you are going to be asking her.

Tr. at 1-4 (emphasis in bold).[1] Using Shaughnessy as an interpreter, Rafferty then explained that he would ask the Defendant about her identity and about the person who helped the Defendant receive a license "[w]ith another name." <u>Id.</u> at 4-5.

---

[1] The Government has not object to any portion of the interview transcript provided by the Defendant at Docket No. 31-1, including the translations of statements made in Spanish.

Shaughnessy asked if the Defendant wanted to talk about that subject, and she said "No." Id. at 5.

Shaughnessy then asked if the Defendant wished to end the interview. Id. Rafferty translated this question as, "Do you want to end everything?" Id. The Defendant responded "No, keep asking questions then." Id. Rafferty then explained, via Shaughnessy, that he would ask about the Defendant's name, date of birth, and children. Id. The Defendant agreed to provide this information. Id. Rafferty asked for, and the Defendant provided, her birthplace, Social Security number, citizenship status, hair color, weight, height, address, occupation, work address, parents' names, spouse's name, children's name and ages. Id. at 5-11.

Shaughnessy then made the following statements in Spanish, translating for Rafferty, whose statements in English are omitted here:

```
    He is going to explain to you . . . If you don't want to
talk, it's fine. . . . He has a warrant to arrest . . . Stealing
identification . . . Using the identification of a different
person . . . Using the social security number of that man. Of
that person . . . That you had a license of another person here
in Massachusetts . . . It is . . . of that one . . . The
application . . . Birth certificate . . . Social number . . That
he knows it is your real name . . . Receiving uh . . . you put
papers to receive things for your husband . . . Your right if
you don't want to talk . . . If you can help . . . To know how
you received those things . . . He will talk to the lawyer . . .
That is against you . . . He will tell to the prosecutor that
you are helping . . . And cooperation . . . If you want to talk
to him . . . it is your right. If you don't want to, it is all
right . . . . If you don't want to say anything with anything .
```

. . . like nothing, that's fine . . . Which one do you want? . . . It is not a very long thing right now . . . You can go, uh, to jail with that one . . . Do you want to talk to him right now? . . . And you explain to him . . . And, to help . . . Or, if you don't want to that is fine.

Id. at 12-15. The Defendant, who had not spoken during the statements above, then responded "I don't remember." Id. at 15. Rafferty then asked the Defendant questions regarding her Massachusetts RMV application, driver's license, and electricity bills. Id. at 16-22. He also asked the Defendant to initial and date a photo of herself, an RMV application, a birth certificate, and a Social Security card. Id. at 16, 23-25. The officers asked the Defendant if she knew that some of the documents belonged to a real person in Puerto Rico. Id. at 28-29. The Defendant replied "Yes." Id. at 29.

Lara Lara was subsequently charged with (1) False Representation of a Social Security Number, for the use of another's Social Security number on an application for a Massachusetts driver's license, and (2) Aggravated Identity Theft, for the knowing use of identification of another in relation to an enumerated felony. See Docket No. 17.

In January 2020, Lara Lara signed an affidavit stating that, during the April 2019 interview, she "said at least a few times that [she] did not want to speak to [the officers], but the officers continued to ask if [she] wanted to speak to them and continued to ask [her] questions." Docket No. 31-3. Lara

6

Lara also stated that she has "since learned that the officer who was translating did not translate every question [she] was asked or every answer [she] gave." Id.

## LEGAL STANDARD

The Fifth Amendment protects a criminal defendant against being "compelled . . . to be a witness against himself" during a custodial interrogation.[2] Miranda v. Arizona, 384 U.S. 436, 467 (1966). Miranda requires law enforcement officers to, in clear and unequivocal terms, notify an accused individual of her right to remain silent and assure that this right is scrupulously honored. Id. at 467-68; Michigan v. Mosley, 423 U.S. 96, 103 (1975) (citing Miranda, 384 U.S. at 479). Once an individual expresses her wish to remain silent, which can occur at any time before or during questioning and in any manner, questioning "must cease." Miranda, 384 U.S. at 473-74. These protections "are designed 'to protect against the extraordinary danger of compelled self-incrimination that is inherent'" in custodial interrogations. United States v. Hughes, 640 F.3d 428, 434-35 (1st Cir. 2011) (quoting United States v. Melendez, 228 F.3d 19, 22 (1st Cir. 2000)).

---

[2] The Government does not contest that Lara Lara was subject to a custodial interrogation, such that the protections of Miranda applied. See Docket No. 40 at 6-7; Docket No. 39 at 5-8.

**DISCUSSION**

I. <u>**Initial Waiver of Rights**</u>

The Government argues that Lara Lara voluntarily waived her <u>Miranda</u> rights, including the right to remain silent, because she signed an ICE form to that effect before the interview began and told agents that she understood her rights. Lara Lara contends that this waiver was not voluntary, in part because the ICE form included only one signature line and did not specify where one should sign if she understood her rights but did not wish to waive them.

A court evaluating "whether a defendant voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights" looks to "not only the nature of the police conduct but also such factors as the suspect's age, education and past criminal experience, and whether the suspect had the capacity to understand both the warnings given him and the consequences of waiving his rights." <u>United States v. Barone</u>, 968 F.2d 1378, 1384 (1st Cir. 1992). Even if the Defendant initially waived her rights voluntarily, knowingly, and intelligently, she remained free to invoke them at any point during the interrogation. <u>See Miranda</u>, 384 U.S. at 473-74. Because the Court concludes below that Lara Lara invoked her right to remain silent before making

any incriminating statements, it need not decide whether the ICE form constitutes an initial voluntary waiver.

## II. Invoking the Right to Remain Silent

The Defendant argues that she clearly invoked her right to remain silent. The Government contends that the Defendant's invocation was ambiguous because during the first few minutes of the interview the Defendant gave varied responses as to whether she would answer questions.

The Supreme Court has not specified the language necessary to invoke the right to remain silent. However, the Court has explained that "an accused who wants to invoke his or her right to remain silent must do so unambiguously." Berghuis v. Thompkins, 560 U.S. 370, 381 (2010). A statement is unambiguous if "a reasonable police officer in the circumstances would understand the statement to be" an invocation of the right to remain silent. United States v. Andrade, 925 F. Supp. 71, 79 (D. Mass. 1996) (quoting Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir. 1994)); see also Davis v. United States, 512 U.S. 452, 459 (1994). "An accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." Smith v. Illinois, 469 U.S. 91, 100 (1984) (discussing the right to counsel).

I find that Lara Lara unambiguously invoked her right to remain silent at least four, and probably five, times. When

9

asked if she wanted to answer questions, Lara Lara answered "No" twice. See Tr. at 2. This plain statement triggered Miranda protections. Despite Lara Lara's clear invocation of her right, Shaughnessy again asked Lara Lara if she wanted to talk, to which she responded, "It's just that I don't have anything to talk about." Tr. at 3. The Government argues this statement is ambiguous. Regardless, Shaughnessy then asked Lara Lara if she wanted to speak yet again, to which Lara Lara said "No. I don't have to talk. I don't want him to question me." Tr. at 3. No reasonable officer would understand these words to mean "anything other than an expression of a desire to stop answering police questions." United States v. Reid, 211 F. Supp. 2d 366, 372 (D. Mass. 2002). Indeed, Shaughnessy then acknowledged, "[S]he said no. She does not want to talk." Tr. at 3.

Contrary to the government's arguments, Lara Lara's subsequent statements cannot be used to "cast retrospective doubt on the clarity of [her] initial request." See Smith, 469 U.S. at 100; see also id. at 99 n.7 (explaining that, once invoked, a Miranda right could not "be dissipated by continued police questioning"). Cf. Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th Cir. 2001) (considering context of defendant's conversation with law enforcement prior to defendant's invocation of the right to remain silent, but not after); Medina v. Singletary, 59 F.3d 1095, 1104 (11th Cir. 1995) (same). At

10

the hearing, Rafferty claimed he questioned the Defendant repeatedly because the use of an interpreter created uncertainty. I am not persuaded: "No" means "No" understandably and objectively in both English and Spanish.

### III. Scrupulously Honoring the Right

Once the right to remain silent has been invoked, officers may continue questioning only if they "scrupulously honor[]" the right. Mosley, 423 U.S. at 104. The court determines whether the right was scrupulously honored by looking to the totality of the circumstances. United States v. Oquendo-Rivas, 750 F.3d 12, 18 (1st Cir. 2014). Specifically, the court considers "(1) whether a reasonable period of time passed prior to the resumption [of questioning], (2) whether the same officer resumed questioning, (3) whether the suspect received fresh Miranda warnings, and (4) whether questioning concerned the same alleged crime." Id. at 17-18. The right to remain silent is not scrupulously honored if there are "repeated attempt[s] to reverse a refusal to talk through undue pressure," United States v. Andrade, 135 F.3d 104, 107 (1st Cir. 1998), and "repeated efforts to wear down [a suspect's] resistance and make him change his mind." Mosley, 423 U.S. at 105-06.

Under the totality of the circumstances, Lara Lara's right to remain silent was not scrupulously honored. First, a reasonable period of time did not pass prior to the resumption

11

of questioning. The First Circuit has expressed disfavor for "police practices that give suspects only a momentary respite after their refusal to make a statement." Oquendo-Rivas, 750 F.3d at 18 (noting that a delay in questioning of only twenty minutes "g[ave the Court] pause"); see also Mosley, 423 U.S. at 102 ("To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned."). Here, the officers did not pause their questioning at all after Lara Lara stated that she did not wish to speak with them. See Tr. at 2-4. Second, the same officers resumed questioning after Lara Lara refused to speak. Third, Lara Lara did not receive fresh Miranda warnings before questioning resumed, even though she explicitly asked whether her statements could be used against her. See Tr. at 4 (Lara Lara: "Isn't it that supposedly what I say may be used against me?"; Shaughnessy: "Sorry?"). Fourth, the resumed questioning concerned the same alleged crime.

Here, the purpose of the resumed questioning was likely to wear the Defendant down and to persuade her to abandon her right to remain silent. See Mosley, 423 U.S. at 105-06; see also Barone, 968 F.2d at 1385 & n.9 (finding right to remain silent was not scrupulously honored where officers "repeatedly spoke to [the defendant] for the purpose of changing his mind, failed to

provide new Miranda warnings, [and] applied pressure by emphasizing the danger [of not cooperating]").

At hearing, the Government argued in the alternative that Lara Lara voluntarily waived her right to remain silent because after invoking the right, she responded to the officers' continued questions by asking "What is it that we are going to talk about?" and stating "[K]eep asking questions, then." Tr. at 4, 5. It is true that "law enforcement may resume questioning a defendant in custody who has exercised his right to remain silent if the defendant subsequently initiates further discussions about the investigation." United States v. Thongsophaporn, 503 F.3d 51, 56 (1st Cir. 2007). However, this rule applies only where law enforcement has complied with its obligation under Miranda to scrupulously honor the defendant's right to remain silent. Compare id. at 56-57 (finding voluntary waiver where officers asked no questions between defendant's invocation of the right and defendant's re-initiation of conversation, and provided renewed Miranda warnings before reinitiating questioning), and Bui v. DiPaolo, 170 F.3d 232, 240-41 (1st Cir. 1999) (finding voluntary waiver where defendant invoked the right but immediately made a statement without any questioning by the police), with Barone, 968 F.2d at 1384 (holding that a voluntary waiver analysis was "irrelevant" where officers continued asking questions after defendant invoked the

13

right to remain silent). Statements made by Lara Lara in response to the officers' continued questioning are therefore inadmissible.

## **ORDER**

Accordingly, Defendant's motion to suppress (Docket No. 31) is **ALLOWED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge